UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/3/2024
```

------------------------------------------------------------ X
                        :
VIDERI, INC.,                   :
                        :
                 Plaintiff,   :             1:23-cv-2535-GHW
                        :
              -v -             :     MEMORANDUM OPINION &
                        :               ORDER
ONAWHIM (OAW) INC.,       :
                        :
                 Defendant.   :
                        :
------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Plaintiff Videri, Inc. ("Videri" or "Plaintiff") designs and sells ultrathin digital flatscreens, which it has marketed as "Canvases" since at least 2014. Defendant ONAWHIM (OAW) INC. ("OAW" or "Defendant") is a Videri spinoff that took with it one of Videri's flatscreen lines, called "WHIM."

The "Canvas" and "WHIM" flatscreens are visually very similar, but the spinoff arrangement was intended to keep Videri and OAW from competing. The companies agreed to confine their commercial activities to distinct markets, with Videri selling exclusively to commercial enterprises and OAW selling exclusively to end-users. That way, in theory, businesses would continue to associate ultra-thin flatscreens with Videri's "Canvases," while individual consumers might think of OAW's "WHIM."

The spinoff was also intended to account for the parties' next generations of flatscreens, both of which were in development at the time. The parties agreed to cross-license the intellectual property pertaining to their respective flatscreens, and to collaborate and share information regarding their next-generation products. In particular, Videri's upcoming flatscreens were to be lower-cost derivatives of OAW's. OAW, accordingly, assumed much of the initial burden of

development and information-sharing, so that Videri could then develop its cheaper version.

This entire arrangement has fallen apart, and Videri now alleges violations of each of the core tenets of the parties' agreement. According to Videri, OAW utterly failed to collaborate regarding the development of Videri's upcoming displays, misappropriated Videri's "Canvas" mark and marketed it to businesses, and even took Videri's office equipment and tooling without authorization. On these allegations, Videri brings a trademark claim, two contract claims, an implied-covenant claim, and a conversion claim. Videri also seeks a declaration that it validly terminated one of the parties' contracts after OAW's material breach.

Because Videri has adequately pleaded that OAW used the "Canvas" mark beyond the scope of its license, and because their licensing agreement did not preclude termination in such circumstances, Videri's trademark and declaratory-judgment claims survive. On the other hand, Videri's implied-covenant claim is duplicative of its contract claims, and its conversion allegations are impermissibly hypothetical. Accordingly, OAW's motion to dismiss the First Amended Complaint is GRANTED IN PART and DENIED IN PART.

## II.    BACKGROUND[1]

### A.  The Parties and the "Canvas" Mark

Videri designs and sells ultra-thin flatscreens that display programmable digital content. FAC ¶¶ 2–3. Since "at least 2014," Videri has continuously marketed these flatscreens as "Canvases." *Id.* ¶ 108. Videri has allegedly "invested substantial resources in developing and promoting" the "Canvas" brand, to the point that "the 'Canvas' mark identifies Videri as the source

---

[1] The facts are drawn from the First Amended Complaint, Dkt. No. 16 ("FAC"), and the agreements attached thereto, Dkt. Nos. 16-1 & 16-2, and are accepted as true for the purposes of this motion to dismiss. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Certain facts are also drawn from the Court's review of a web page linked in the FAC, on which Plaintiff relies to allege various trademark infringements. *See Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 693 n.4 (S.D.N.Y. 2009) ("Because the Website is incorporated by reference into the Complaint, the Court may consider it on a motion to dismiss."). As discussed *infra*, the Court relies, for the purposes of this motion, on Exhibit 4 to Defendant's Declaration of Mark Cuccaro, Dkt No. 33 (the "Declaration"), which provides a printout of that web page from around the time of this dispute.

of the product." *Id.* ¶¶ 108–09.  Videri has not registered "Canvas" as a trademark in connection

with its flatscreen products.  *See id.* ¶¶ 106–13.

In May 2021, Videri's former CEO, Marc Trachtenberg, was bought out of the company,

taking with him the rights to Videri's "WHIM" brand of flatscreens.  *Id.* ¶¶ 14–15.  He formed

OAW to sell and market flatscreen products under the "WHIM" brand.  *Id.* ¶ 15.

### B.  The Contracts

In August 2021, as part of the buyout arrangement, Videri and OAW agreed to two

contracts:  a Cross-License Agreement (the "License Agreement"); and a Mutual Transitional

Services Agreement (the "Services Agreement").  *Id.* ¶ 17; *id.* Ex. A, Ex. B.

### i.  The License Agreement

In the License Agreement, the parties cross-licensed certain existing and future intellectual

property pertaining to their flatscreen products.  *Id.* ¶ 29; *id.* Ex. B §§ 2.1(A)–(B).  Videri's license to

OAW provided:

> VIDERI hereby grants to ONAWHIM, and ONAWHIM hereby accepts the grant
> from VIDERI of (i) an exclusive, royalty-free, fully-paid, worldwide license under the
> VIDERI Patents to make, have made, use, sell, offer for sale, import, and otherwise
> transfer or dispose of products and services for use in the ONAWHIM Field, and (ii)
> an exclusive, royalty-free, fully-paid, worldwide license under the VIDERI Proprietary
> Information to use, copy, perform, display, distribute, translate and modify the
> VIDERI Proprietary Information in connection with the design, manufacture, use,
> sale, offer for sale, and commercialization of products and services for use in the
> ONAWHIM Field . . . .

*Id.* Ex. B § 2.1(A).  The License Agreement further provided for cross-licensing of the

"technology and anticipated . . . improvements" to the parties' respective flatscreen products.  *Id.*

¶ 29; *id.* Ex. B §§ 1.11–13, 1.16–17, 1.20.  Videri also irrevocably assigned to OAW various marks

and domains, including the domain name "onyourcanvas.com."  *Id.* Ex. B § 3.1, Appendix C.

The License Agreement defined separate "Fields," or markets, in which each party could use

the licensed intellectual property.  *Id.* Ex. B §§ 1.10, 1.15, 2.1; *id.* ¶ 16.  OAW's permitted market was

defined as "products and services sold or distributed via any and all channels to end-user consumers, and never as a business-to-business offering by [OAW] in the digital signage, Out of Home ("OOH"),[2] or corporate communications fields." *Id.* Ex. B § 1.10; *see also id.* Ex. B § 2.1(H) (providing that OAW "shall not, in connection with the VIDERI License or otherwise, enter the digital signage, Out of Home (OOH), and corporate communications fields"); Ex. B § 4.3(B)(iii) ("[OAW] shall not itself market or sell . . . products or services covered or embodies by the VIDERI Patents or VIDERI Proprietary Information, for uses outside the [OAW] Field."). Videri was permitted to use the licensed intellectual property in any other, non-excluded market, namely "products and services sold or distributed in a manner not included in the [OAW] Field." *Id.* Ex. B § 1.15.

The License Agreement also obligated the parties to share technical information, including "all trade secrets, unpatented inventions and discoveries, research, development, programming, [and] designs," regarding their products within 30 days of execution of the agreement, and then to provide monthly updates of any modifications to that information. *Id.* Ex. B §§ 1.13, 1.20, 2.1(D).

The License Agreement provides that it "shall terminate forthwith upon expiration or termination of this Agreement pursuant to Article IX." *Id.* Ex. B § 2.1(A). Article IX is a "Term and Termination" clause. The "Term" section of the clause provides:

> (A) Subject to the provisions for earlier termination set forth below, this Agreement shall expire on the date on which (i) all of the VIDERI Patents and ONAWHIM Patents have expired, or all of the valid claims of all of the VIDERI Patents and ONAWHIM Patents have been declared invalid and unenforceable in unappealed and unappealable decisions of one or more courts of competent jurisdiction, and (ii) all of the VIDERI Proprietary Information and all of the ONAWHIM Proprietary Information is subject to one or more of the exceptions to non-disclosure set forth in Section 7.1(A) above.

---

[2] The License Agreement references, but does not define, out-of-home or "OOH" advertising. FAC, Ex. B §§ 1.10, 2.1(H). The FAC alleges that OOH advertising "generally refers to various forms of outdoor advertising, such as billboards, or other advertising that consumers encounter away from home, including digital signage that can be seen at public transit stops or vehicles or in other venues, like sports arenas, malls, or retail stores." *Id.* ¶ 35. Defendant does not dispute that this characterization applies in the License Agreement.

*Id.* Ex. B § 9.1(A). Two termination provisions ensue. In relevant part, they provide:

> (B) This Agreement may be terminated by VIDERI if ONAWHIM commits a Payment Breach under the Services Agreement. A "Payment Breach" shall occur only when all of the following occur: (i) ONAWHIM fails to pay any invoices that have been pre-approved in writing under the Services Agreement (the "Invoices"); (ii) such Invoices remain outstanding for ten (10) or more days; (iii) the invoicing party thereafter provides written notice of non-payment (email to the signatories hereof, with "read receipt," is sufficient); and (iv) the invoiced party fails to make payment within twenty (20) days thereafter. . . .
>
> (C) This Agreement and the License shall forthwith terminate upon the mutual written agreement of the Parties.

*Id.* Ex. B § 9.1(B)–(C). Thus, Article IX provides that the License Agreement "shall expire" when all relevant intellectual property becomes unenforceable; "shall forthwith terminate" on written consent of both parties; and "may be terminated" by Videri if OAW commits a Payment Breach under the Services Agreement. *Id.* Ex. B § 9.1.

### ii.  The Services Agreement

The parties also executed the Services Agreement, which set out OAW's obligations regarding Videri's next-generation flatscreens. The parties agreed that Videri's upcoming generation of flatscreens, the "NEXT-Enterprise (NEXT-E) Canvases," would be "derivative products based on designs for" OAW's next generation of flatscreens, the "ONAWHIM NEXT platform." *Id.* Ex. A at Ex. B. OAW was required to "provide VIDERI with overall management and all necessary and appropriate technical services to create a lower cost derivative canvas based on [OAW's] next generation canvas." *Id.* This included "such narrative works, spreadsheets, graphics, specifications, data, compilations of data, software and hardware development, knowledge transfer, transition services and other works as may be requested by [Videri]." *Id.* Ex. A § 1.1. The Services Agreement expired on August 3, 2022, the first anniversary of its execution. *Id.* Ex. A § 3.1.

Under the Services Agreement, OAW was "responsible for all costs associated with the development of the WHIM NEXT platform, which comprises the majority of the work for creating

the basis for the VIDERI NEXT E." *Id.* Ex. A at Ex. B. Videri was "responsible for NEXT E specific development costs only." *Id.* OAW was required to "consult with VIDERI and receive written approval to change any of the specifications for the NEXT-E Canvases." *Id.* The availability of Videri's "NEXT E products [would] be within 60 days of the release of WHIM NEXT assuming VIDERI has met the deadlines for specification decisions." *Id.*

**B. Defendant's Alleged Breach of the Services Agreement**

Videri alleges that OAW immediately began breaching the Services Agreement. *Id.* ¶ 51; *see also id.* ¶¶ 8, 40. According to Videri, OAW generally refused to provide management and technical services regarding the development of Videri's next-generation flatscreens, despite repeated requests over several months. *Id.* ¶¶ 50, 53–64. Eventually, OAW "supplied some high-level and basic design information . . . that fell far short of what was necessary for Videri to understand the status of the work that OAW had been undertaking." *Id.* ¶ 66.

OAW also allegedly refused for months to provide a timeline for its release of the WHIM NEXT, which was to be the predicate for Videri's next-generation product. *Id.* ¶¶ 50, 66. Eventually, on June 20, 2022, OAW sent Videri a presentation that promised all WHIM NEXT models would be complete by December 2022. *Id.* ¶ 153. OAW allegedly failed to meet this deadline, and ultimately abandoned development of the WHIM NEXT platform entirely. *Id.* ¶ 155. Later, in August 2022, Plaintiff allegedly "discovered though conversations with Mr. Trachtenberg and others that OAW had no intention to actually manufacture or produce" certain of its next-generation products, nor "Videri's NEXT E series." *Id.* ¶ 67. "For example, Videri learned that OAW had undertaken no efforts to begin engineering or tooling for the NEXT E series canvases." *Id.* As a result, Videri was allegedly forced to "start from scratch" in the development of its next-generation flatscreens, taking on designing, testing, and manufacturing costs for which OAW was responsible under the Services Agreement. *Id.* ¶ 49; *see also id.* ¶¶ 44–46, 48 (alleging that Videri was

forced to "incur more than $1 million in additional out-of-pocket development expenses that OAW had agreed to pay in the Services Agreement").

### C. Defendant's Alleged Misappropriation of the "Canvas" Mark and Breach of the License Agreement

Videri also alleges that OAW misappropriated the "Canvas" mark and used it to compete with Videri in Videri's designated "Fields," *i.e.*, the markets designated exclusively for Videri in the License Agreement. *Id.* ¶ 69–71. Videri alleges three actions by OAW that did so.

First, Videri alleges that OAW has established "The WHIM Experience Lounge" at the Oculus in the World Trade Center,[3] in partnership with a company called "The Canvas."[4] *Id.* ¶¶ 72, 78. "[C]onnected to" the WHIM Experience Lounge is what OAW calls the "Web3 Hub." *Id.* ¶ 77. To market the Web3 Hub, OAW's website allegedly described the Web3 Hub as follows:

> The Canvas, in partnership with WHIM, are looking to collaborate with leading metaverses, marketplaces, projects, creators, platforms, wallets, and brands to create unforgettable events in the ultimate WEB3 space. With over 15000 sq ft of gorgeous space and up to 80 WHIM canvases in multiple installations with different configurations in five distinct areas, the Web 3 Hub is powered-up and ready for an array of events including, parties, galleries, brand activations, workshops, the only limit is your imagination.

*Id.* ¶ 78. Elsewhere, OAW's website allegedly "advertised the Web3 Hub as a space available for 'brand activations,' . . . 'galleries,' and 'exhibits,'" and reiterated that it had "over 15000 sq ft of

---

[3] According to the FAC, "The Oculus is a hub for 12 subway lines, dozens of retail stores, and advertises that it serves 'over a million people every week.'" FAC ¶ 73 (citation omitted).

[4] Defendant argues that "it is clear from [The Canvas's] website . . . that this gallery is owned and operated by a fashion business coincidentally named The Canvas, which also operates a clothing store at another location in the Oculus." Mem. at 10–11 (emphasis omitted). Defendant argues that it "bears no responsibility for [The Canvas's] name, which The Canvas has been using in its business of selling clothing—entirely unrelated to the products at issue in this case— since before OAW existed." Reply at 1–2. As explained *infra*, Defendant's argument relies on consideration of pages in The Canvas's website that are not cited or relied upon in the FAC, and are therefore not properly considered on a motion to dismiss. Mem. at 11 (citing to Exhibits 1, 2, 3, and 5, which the Court declines to consider). On the page of The Canvas's website that Plaintiff does cite to in its complaint, The Canvas invites the reader to "[s]howcase your collection in [its] gallery," and to "host an event in [its] gallery." Declaration, Ex. 4 at 3–4. The Canvas also advertises its "gallery and hub . . . in partnership with WHIM" using a picture of a wall with what appear to be digital flatscreen displays. *Id.* at 2. Accordingly, the Court declines at this stage to accept Defendant's characterization of The Canvas as a company that has nothing to do with the flatscreen products at issue in this case. *See Simon v. KeySpan Corp.*, 694 F.3d 196, 198 (2d Cir. 2012) ("In reviewing a motion to dismiss, we . . . draw all reasonable inferences in the plaintiff's favor.").

gorgeous space and up to 80 WHIM canvases in multiple installations." *Id.* ¶ 80.  Videri alleges that

these advertisements are "'out of home' and business-to-business marketing activities" in markets

which the License Agreement designates exclusively for Videri.  *Id.* ¶¶ 81–82.

Second, pursuant to a partnership with AI Fashion Week, OAW allegedly advertised its

products on social media to AI fashion creators.  *Id.* ¶ 83.  One such advertisement invited creators

to "SHOWCASE [THEIR] AI FASHION COLLECTION . . . WITH WHIM.  THE BEST

DIGITAL CANVASES YOU CAN FIND ON THE MARKET!"  *Id.*  Videri alleges that this too is

an "'out of home' advertisement and business-to-business marketing that infringes on [Videri's]

Field."  *Id.* ¶ 86.

Third, OAW allegedly "developed a partnership to open a Web 3.0 gallery called the Canvas

3.0."  *Id.* ¶ 115.  "The Canvas 3.0 is a physical gallery that uses digital screens virtually identical to

Videri's Canvas to create displays, much like an art gallery."  *Id.*

On November 28, 2022, following these and other alleged breaches,[5] Videri sent a letter to

OAW purporting to terminate the License Agreement for material breach.  *Id.* ¶¶ 89–90.  Videri

does not allege that any of the events specified in the License Agreement's Term and Termination

provision occurred before Videri sent the termination letter.  OAW has allegedly continued to use

Videri's intellectual property since the termination.  *Id.* ¶ 91.

### D.  Alleged Conversions

#### i.  Videri North's office equipment.

Videri also alleges that OAW converted certain office equipment from Videri's Canadian

affiliate, Videri North Corp. ("Videri North").  Videri North leases several offices in Montreal.  *Id.*

---

[5] Videri alleges that OAW's failures to provide technical information, in addition to violating the Services Agreement, also violate the License Agreement.  FAC ¶ 89.  Videri also alleges that OAW sold flatscreen products to a gym in Montreal, Canada, which allegedly fell within Videri's "Field" under the License Agreement.  *Id.* ¶¶ 87–88.  Because OAW does not contest Videri's contract claims in its motion to dismiss, these allegations are not the subject of this opinion.

¶ 92.  Defendant's subsidiary, WHIMWORKS, INC. ("WW"), allegedly "occupied the space," using it for various engineering and manufacturing functions.  *Id.* ¶ 93.  Videri alleges that, in a Canadian action for unpaid rent, WW argued that it occupied the space for free "pursuant to an alleged [oral] agreement between OAW and Videri," in return for forgiveness on a $957,502 debt owed by Videri to OAW.  *Id.* ¶ 94–95.

In March 2023, WW vacated Videri North's office.  *Id.* ¶ 103.  Videri alleges that WW "took with it property belonging to Videri, including laptops and other equipment."  *Id.* ¶¶ 103, 160–61.  As to OAW's involvement, Videri alleges that WW "did so based on permission from OAW."  *Id.* ¶ 162.

### ii.  Tooling

Videri also alleges conversion of certain tooling built in connection with the parties' development of their next-generation flatscreens.  Videri allegedly paid OAW for "tooling and production of prototypes" in connection with the development of OAW's WHIM NEXT platform, on which Videri's NEXT E products would be based.  *Id.* ¶ 45.  OAW, in turn, "engaged a third-party electronics manufacturer" to build certain tooling for the WHIM NEXT.  *Id.* ¶ 42.  As already described, however, OAW later allegedly abandoned development of the WHIM NEXT product.  *Id.* ¶ 165.

Videri now claims ownership of this tooling.  *Id.* ¶ 167.  It alleges that OAW also claims ownership of the tooling.  *Id.* ¶ 166.  The third-party manufacturer who is in possession of the tooling has allegedly "expressed confusion over which entity owns the tooling."  *Id.* ¶ 47.  Videri alleges that, "[i]f OAW were to refuse to permit Videri to use the tooling, it would create further delays" in Videri's development of its own NEXT E products.  *Id.* ¶ 166.  However, Videri does not allege that it demanded the tooling from OAW.  *See id.*

### III.  Procedural History

Plaintiff initiated this action on March 24, 2023. *See* Dkt. No. 1. Plaintiff filed the FAC on April 27, 2023. Dkt. No. 16. The FAC brings five causes of action against Defendant, for (1) violation of Lanham Act, 15 U.S.C. § 1125, *id.* ¶¶ 106–22, (2) breach of the License Agreement, *id.* ¶¶ 123–35, (3) breach of the Services Agreement, *id.* ¶¶ 136–44, (4) breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 145–57, and (5) conversion of the office equipment and tooling, *id* ¶¶ 158–69. Plaintiff's sixth cause of action seeks a declaration that it validly terminated the License Agreement as a result of Defendant's alleged material breach. *Id.* at ¶¶ 170–178.

Defendant moved to dismiss the FAC on November 7, 2023. Dkt. No. 32; Dkt No 33; Dkt. No. 34 ("Mem."); Dkt. No. 35 ("Opp'n"); Dkt. No. 36 ("Reply").

Defendant's reply brief raised a fair-use defense for the first time. Reply at 6–8. On December 23, 2023, the Court granted Plaintiff's request to submit a surreply responding to the fair-use argument, and allowed Defendant to submit a subsequent response. Dkt. No. 39. Plaintiff submitted its surreply on January 4, 2024. Dkt. No. 41 ("Surreply"). Defendant responded on January 11, 2024. Dkt. No. 42 ("Surreply Opp'n").

## IV.    LEGAL STANDARD

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are inadequate. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And "[t]he tenet that a court must accept as true" a complaint's factual allegations does not apply "to

legal conclusions." *Id.*

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim. *Twombly*, 550 U.S. at 570.  A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  The plaintiff's claim must be more than merely "speculative."  *Twombly*, 550 U.S. at 545.  And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility.  *Iqbal*, 556 U.S. at 679 (citation omitted).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint."  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006).  But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' [or] incorporated in it by reference."  *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)).  A court may also consider a written instrument if it "is integral to the complaint."  *Id.*  (quotation omitted).  A pleading incorporates a document by reference where it makes "a clear, definite and substantial reference to the document[]."  *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y.2003)).  On the other hand, "[l]imited quotation from or reference to documents that may constitute relevant evidence . . . is not enough to incorporate those documents, wholesale, into the complaint."  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

Courts reviewing a motion to dismiss may also consider "matters of which judicial notice may be taken."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).  Federal Rule of Evidence 201(b) permits a court to take judicial notice of facts that are "not subject to reasonable dispute" because they (1) are "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  "The court . . . must take judicial notice if a party requests it and the court is supplied

with the necessary information." Fed. R. Evid. 201(c)(2).  Nevertheless, "[b]ecause the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir.1998) (citing Fed. R. Evid. 201(b) advisory committee notes).  "Courts need not take judicial notice of irrelevant facts or documents." *Colon v. City of New York*, No. 16-CV-4540 (VSB), 2023 WL 6497650, at *2 (S.D.N.Y. Oct. 5, 2023); *accord United States v. Byrnes*, 644 F.2d 107, 112 (2d Cir. 1981).  While courts have, under these standards, "taken judicial notice of materials in the public record, such as federal [trademark] registrations . . . and regulatory filings," they have done so "for the limited purpose of noting what the documents state, rather than to 'prove the truth of their contents.'" *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462–63 (S.D.N.Y. 2020) (quoting *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436 (S.D.N.Y. 2014)) (judicially noticing trademark-registration documents, but "only for 'determining what the documents state,'" not for "the truth of their contents" (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007))); *accord Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008) (observing that courts may not take judicial notice of publicly filed documents "for the truth of the matters asserted in them"); *Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 380 (S.D.N.Y. 2016) (similar).

Defendant's motion to dismiss is accompanied by the Declaration of Mark Cuccaro, which attaches eight exhibits, Dkt. No. 33 (the "Declaration"), and the Supplemental Declaration of Mark Cuccaro, which attaches two exhibits, Dkt. No. 43 (the "Supplemental Declaration").  Exhibit 4 of Defendant's Declaration is a printout of a specific page within The Canvas's website, "https://thecanvas.global/pages/the-canvas-3-0."  The FAC links to this page, and quotes from it to explain how "The Canvas describes itself."  FAC ¶ 79.  In the quoted language, The Canvas describes itself as "a gallery and hub for Web 3.0 activities in partnership with WHIM," and

advertises to "independent creators" the possibility of holding "events, activations and installations" at The Canvas. *Id.*; Declaration Ex. 4. This quote forms part of the basis for Plaintiff's claim for breach of the License Agreement, because the advertisement allegedly infringes on Plaintiff's designated "Field." *See id.* ¶¶ 75–82 (alleging that Defendant's partnership with The Canvas to create a physical gallery with similar flatscreens is an "'out of home' and business-to-business marketing activit[y] in violation of the License Agreement"). The quote also forms part of the basis for Plaintiff's trademark claim, because Defendant's use of its similar products at The Canvas's location and its reference to those products as "WHIM canvases" "are likely to cause market confusion or mistake." *Id.* ¶¶ 115–18 (alleging that the gallery Defendant opened in partnership with The Canvas "uses digital screens virtually identical to [Plaintiff's] Canvas," and thus that Defendant's "use of Canvas to describe its similar products and physical gallery" are likely to cause consumer confusion). The Court finds that the FAC makes a "clear, definite and substantial reference" to this page of The Canvas's website, and therefore considers the content of Exhibit 4 to Defendant's Declaration for the purposes of this motion. *Madu*, 265 F.R.D. at 123.[6]

Exhibits 1, 2, 3, 5, and 6 of Defendant's Declaration are printouts of other pages from elsewhere within The Canvas's website. Declaration ¶¶ 3–7. The Court will not consider these exhibits. The FAC does not link to, quote from, or otherwise rely on those pages of the website. *See* FAC ¶ 79. Plaintiff's targeted quotation from a specific page within "thecanvas.global" domain

---

[6] Both parties in this case accept the position that the content of this page may be considered as incorporated by reference into a complaint. FAC ¶ 79; Mem. at 10; Opp'n at 7. There is ample case law that supports their shared view. *See, e.g., Mockingbird 38, LLC v. Int'l Bus. Times, Inc.*, No. 21-CV-283 (LJL), 2022 WL 154137, at *4 n.4 (S.D.N.Y. Jan. 18, 2022); *Orozco v. Fresh Direct, LLC*, No. 15-CV-8226 (VEC), 2016 WL 5416510, at *5 & n.8 (S.D.N.Y. Sept. 27, 2016) (gathering cases); *Atl. Recording Corp.*, 603 F. Supp. 2d at 694 n.3 (drawing facts, for the purpose of a motion to dismiss, "from the Court's own review of the [defendant's] website"); *Harbus v. Manhattan Inst. for Pol'y Rsch., Inc.*, No. 19 CIV. 6124 (ER), 2020 WL 1990866, at *1 n.1 (S.D.N.Y. Apr. 27, 2020) (same). Because the question is uncontested, and consideration of the website makes no difference in the outcome of this motion, the Court adopts the parties' position here. However, the Court notes that website pages are not "written instruments," as defined by the Second Circuit. *See Lynch v. City of New York*, 952 F.3d at 79. To the extent that the incorporation-by-reference doctrine is properly limited to "written instruments," as Second Circuit caselaw suggests, a different justification may be needed to justify the consideration of a website in this context. *See generally Doe v. New York Univ.*, No. 1:20-CV-01343-GHW, 2021 WL 1226384, at *11 (S.D.N.Y. Mar. 31, 2021) (examining *Lynch*).

is not, as Defendant contends, a per se incorporation-by-reference of every other page on the website. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (holding "Order Page" from Amazon's website was incorporated by reference because "the complaint alleged injuries . . . made possible only via clicking . . . on the Order Page," but reversing incorporation of "Registration Page" from Amazon's website because the complaint made no allegations regarding that page); *see also Sec. & Exch. Comm'n v. Medallion Fin. Corp.*, No. 21-CV-11125 (LAK), 2022 WL 3043224, at *2 (S.D.N.Y. Aug. 2, 2022) (finding document was not incorporated by reference, noting the plaintiff's allegations concerned the defendant's "conduct" rather than "the terms of [the document]"). Nor are the web pages in these Exhibits integral to the complaint, as the FAC "did not rely heavily upon [the pages'] terms and effect." *Nicosia*, 834 F.3d at 234 (alterations and quotations omitted) (finding separate page within defendant's website was not integral to the complaint). The Canvas is a nonparty to this suit, and the Court will not consider pages from its website that were "neither mentioned nor relied upon by [Plaintiff] in drafting its complaint." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006).

Exhibits 7 and 8 of Defendant's Declaration are public records kept by the State of Delaware regarding The Canvas. Declaration, Ex. 7 (Certificate of Cancelation); *id.*, Ex. 8 (public filing records). Defendant requests that the Court take judicial notice of these records. Mem. at 11 n.5 (citing *Am. Cas. Co. of Reading, PA v. Lee Brands, Inc.*, No. 05 CIV. 6701(SCR), 2010 WL 743839, at *3 (S.D.N.Y. Mar. 3, 2010)). "Courts will take judicial notice of the existence of government records." *Am. Cas.*, 2010 WL 743839, at *3. The Court therefore takes judicial notice of the existence of the Delaware Certificate of Cancelation and public filing records attached to Defendant's Declaration. *See id.* at *3–*4; *Hesse*, 463 F. Supp. 3d at 462.

Exhibits 1 and 2 of Defendant's Supplemental Declaration are Official Letters sent from the United States Patent and Trademark Office ("USPTO") to Samsung Electronics Co., Ltd.

("Samsung") rejecting Samsung's application to register the mark "Digital Canvas" on certain electronic panels and monitors. Dkt. No. 43 ¶¶ 3–4; *id.* Ex. 1 (August 22, 2015 Official Letter from USPTO to Samsung rejecting registration application); *id.* Ex. 2 (March 17, 2016 Official Letter from USPTO to Samsung maintaining rejection of application). Defendant requests that the Court take judicial notice of these records. Surreply Opp'n at 4 n.4. The Court can take judicial notice of the contents of publicly available UPSTO records. *See Hesse*, 463 F. Supp. 3d at 463; *Knowles-Carter v. Feyonce, Inc.*, 347 F. Supp. 3d 217, 222 n.2 (S.D.N.Y. 2018). The Court therefore takes judicial notice of the USPTO letters attached to Defendant's Supplemental Declaration. *Hesse*, 463 F. Supp. 3d at 463.

## V. DISCUSSION

Defendant moves to dismiss several of the claims asserted in the FAC for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Specifically, Defendant argues that Plaintiff fails to state a trademark-infringement claim under 15 U.S.C. § 1125(a) (Count I); that Plaintiff's implied covenant of good faith and fair dealing claim is duplicative of its claim for breach of the Services Agreement (Count IV); that Plaintiff's conversion claims are improperly hypothetical (Count V); and that Plaintiff's declaratory-judgment claim is inconsistent with the License Agreement's termination provision (Count VI). Mem. at 1–2. Defendant does not move to dismiss Plaintiff's breach-of-contract claims (Counts II and III). *Id.* at 4, 6.

The License Agreement and Services Agreement both contain choice-of-law provisions stating that they are to be governed by New York law. FAC, Ex. A § 4.8; *id.*, Ex. B § 8.1. The parties do not dispute that New York substantive law governs in this case. *See* Mem. at 17; Opp'n at 17–18. Accordingly, the Court analyzes Plaintiff's common-law claims under New York law. *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (observing that where "[t]he parties' briefs assume that New York substantive law governs the issues," this is "implied consent . . .

sufficient to establish the applicable choice of law" (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d

509, 514 n.4 (2d Cir. 2001))); *Comprehensive Habilitation Servs., Inc. v. Com. Funding Corp.*, No. 5-cv-9640,

2009 WL 935665, at *10 n.14 (S.D.N.Y. Apr. 7, 2009) (noting that contracts' choice-of-law

provisions apply to corresponding implied-covenant claims).

### A. Trademark Infringement and Unfair Competition under the Lanham Act

Plaintiff has adequately pleaded that Defendant infringed its unregistered trademark. Section

1125(a) of the Lanham Act "protects unregistered trademarks from infringement." *EMI Catalogue*

*P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir. 2000). An unregistered

trademark may be claimed in "any word, name, symbol, or device, or any combination thereof . . .

used by a person . . . to identify and distinguish his or her goods, including a unique product, from

those manufactured or sold by others and to indicate the source of the goods, even if that source is

unknown." 15 U.S.C. § 1127; *EMI Catalogue*, 228 F.3d at 62. Plaintiff alleges an unregistered

trademark in the term "Canvas" as a brand for its digital flatscreen displays. FAC ¶¶ 107–10.

As with registered trademarks, an unregistered trademark will support an infringement claim

if its owner "has a valid trademark entitled to protection and . . . the defendant's use of it is likely to

cause confusion." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997) (quoting

*Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995)) (alteration omitted). In

"determining whether an unregistered mark is entitled to protection" under Section 1125(a), "the

general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most

part applicable." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006)

(quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). The main difference is that an

unregistered trademark does not enjoy presumptions of validity or of the owner's ownership of the

mark. *See Now-Casting Econ., Ltd. v. Econ. Alchemy LLC*, 628 F. Supp. 3d 501, 516 (S.D.N.Y. 2022),

*aff'd*, No. 23-947, 2024 WL 2720235 (2d Cir. May 28, 2024); *B & B Hardware, Inc. v. Hargis Indus., Inc.*,

575 U.S. 138, 142 (2015).

Defendant concedes at this stage that Plaintiff has adequately pleaded ownership and validity of the "Canvas" brand for its flatscreen displays.  Mem. at 9 n.3.  As to ownership, Plaintiff was required to allege that it was the first to use the "Canvas" mark to identify its flatscreen displays, and that it continues to make use of the mark.  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007).  Plaintiff alleges that it was the first to use "[t]he word 'Canvas' . . . to refer to digital flatscreen displays," and that it "has branded its product as Canvas continuously since at least 2014."  FAC ¶¶ 108–09.  As to validity, Plaintiff was required to allege that the "Canvas" mark is "sufficiently 'distinctive' to distinguish [Plaintiff's] goods from those of others."  *Louis Vuitton*, 454 F.3d at 116 (quoting *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005)).  "Marks that are . . . suggestive are considered 'inherently distinctive,' and are automatically entitled to protection under the Lanham Act."  *Genesee*, 124 F.3d at 143.  Plaintiff alleges that the "Canvas" mark is "suggestive because the word 'Canvas' does not inherently connote a digital flatscreen display," and consumers "recognize 'Canvas' [as referring] specifically to [Plaintiff's] products."  FAC ¶ 111.[7]

The question, then, is whether Plaintiff has adequately pleaded that Defendant's use of Plaintiff's mark is likely to cause confusion:  it has.  "The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'"  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003) (quoting 15 U.S.C. § 1127) (alterations in original).  Section 1125(a) establishes a civil cause of action against:

> [a]ny person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading description
> of fact, or false or misleading representation of fact, which . . . is likely to cause

---

[7] In its brief, Defendant signaled an intention to dispute the protectability of the "Canvas" mark "[i]f this case proceeds to the merits."  Mem. at 9 n.3.  But Defendant concedes that this dispute falls "outside the scope of this motion to dismiss."  *Id.*

confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1)(A).  Defendant disputes that it has "used in commerce" the "Canvas" mark under the meaning of the Lanham Act, Mem. at 10–11, and that any alleged use would be "likely to cause confusion," *id.* at 11–13.  Defendant also argues that Plaintiff failed to adequately plead injury under the Lanham Act.  *Id.* at 14.  Finally, Defendant argues that its alleged use of Plaintiff's mark constitutes fair use.  Reply at 6–8.[8]  The Court addresses, and rejects, each argument in turn.

### i.  Defendant's "Use in Commerce" of the "Canvas" Mark

Plaintiff has adequately pleaded that Defendant is using the "Canvas" mark in commerce, as defined in the Lanham Act.  The Second Circuit held in *1-800 Contacts, Inc. v. WhenU.Com, Inc.* that to plead a Lanham Act claim a plaintiff must allege that the defendant has made "use in commerce" of the plaintiff's trademark as defined in 15 U.S.C. § 1127.  414 F.3d 400, 406–07 (2d Cir. 2005).  The Second Circuit later questioned the wisdom of this holding, but expressly declined to overrule it.  *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 131–41 (2d Cir. 2009).[9]  Accordingly, the Court analyzes whether Defendant's alleged conduct meets the definition provided in Section 1127.

Under Section 1127, a mark is "used in commerce" in connection with goods if:

(A)  it is placed in any manner on the goods or their containers or the displays

---

[8] Defendant raised a fair use argument for the first time in its reply brief.  Courts "generally do not consider issues raised in a reply brief for the first time," because the plaintiff "may not have an adequate opportunity to respond."  *United States v. Pepin*, 514 F.3d 193, 203 n.13 (2d Cir. 2008) (quoting *In re Harris*, 464 F.3d 263, 268–69 n.3 (2d Cir.2006)).  However, since Plaintiff "was afforded the opportunity to file a surreply in response to [Defendant's] new argument," the Court will consider Defendant's fair use argument.  *Sacchi v. Verizon Online LLC*, No. 14-CV-423 RA, 2015 WL 1729796, at *1 (S.D.N.Y. Apr. 14, 2015).

[9] Courts in other circuits have also declined to follow the holding in *1-800*, concluding instead that Section 1127 provides the definition of "use" only for purposes of trademark registration, not infringement.  *See N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1220 n.7 (11th Cir. 2008) (declining to follow *1-800*, noting "§ 1127 defines the kind of 'use' needed to acquire registerable trademark rights—not to infringe them." (citation omitted)); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) (noting Section 1127's "use in commerce" language does not govern infringement analysis); *VersaTop Support Sys., LLC v. Georgia Expo, Inc.*, 921 F.3d 1364, 1370 (Fed. Cir. 2019) (similar); *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F. Supp. 3d 334, 344 (D. Del. 2019) (collecting cases holding that Section 1127 "sets the standard for a mark to qualify for protection or registration, not the standard for proving infringement"); *see also* 3 McCarthy on Trademarks and Unfair Competition § 23:11.50 (5th ed.) ("[T]he Lanham Act § 45 definition of 'use in commerce' defines the kind of use needed to register a mark, not to infringe it.").

associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce . . . .

15 U.S.C. § 1127.  This definition is "broad and has a sweeping reach."  *N. Star IP Holdings, LLC v. Icon Trade Servs., LLC*, No. 22-CV-7324 (JGLC), 2024 WL 36978, at *14 (S.D.N.Y. Jan. 3, 2024) (quoting *LoanStreet, Inc. v. Troia*, No. 21 CIV. 6166 (NRB), 2022 WL 3544170, at *10 (S.D.N.Y. Aug. 17, 2022)).  In determining whether the "use in commerce" requirement is met, "we ask whether the trademark has been displayed to consumers in connection with a commercial transaction."  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 306 (2d Cir. 2013).  "A plaintiff is not required to demonstrate that a defendant made use of the mark in any particular way to satisfy the 'use in commerce' requirement."  *Id.* at 305.

Particularly relevant here, the use of an infringing mark to market one's goods on the internet has repeatedly been found to constitute "use in commerce," especially where that use interferes with the plaintiff's ability to offer its own products.  *Trane Int'l Inc. v. Calentadores de Am., S.A. de C.V.*, No. 21CV4497 (DLC), 2022 WL 1523527, at *4 (S.D.N.Y. May 13, 2022) (finding "the use of [plaintiff's] mark on [defendant's] website and . . . Twitter account constitutes use in commerce, in connection with the advertising of goods"); *LoanStreet*, 2022 WL 3544170, at *10 (finding "use in commerce" requirement satisfied where defendant purchased advertisements via Google's advertising platform that publicly displayed plaintiff's trademark) (gathering cases); *World Wrestling Fed'n Entmt., Inc. v. Bozell*, 142 F. Supp. 2d 514, 528 (S.D.N.Y. 2001) (same, where defendant posted statements online using plaintiff's mark that "affected [plaintiff's] ability to attract and retain customers"); *N. Star*, 2024 WL 36978, at *14–*15 (same, where defendant made "continued use of the [infringing marks] to advertise and promote [defendant's] business" on its website and social media).  Plaintiffs are not, as Defendant urges, required to plead actual purchases of products branded with the infringing mark.  *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 240

(S.D.N.Y. 2013) (finding "use in commerce" requirement satisfied where defendant offered products on its website using plaintiff's trademark, but "nowhere allege[d] that consumers actually *purchased*" defendant's products); *Trane*, 2022 WL 1523527, at *4 (similar); *N. Star*, 2024 WL 36978, at *15 (holding that "cessation [of sales] does not insulate [the defendant] from liability in the face of its continued use of the [plaintiff's marks] to advertise or promote its business"); *Peek & Cloppenburg KG v. Revue, LLC*, No. 11-CV-5967 (DAB), 2012 WL 4470556, at *4 (S.D.N.Y. Sept. 19, 2012) (finding allegations of marketing using infringing trademark constituted "use in commerce," "even if [plaintiff] did not ship the goods itself").

Nor are plaintiffs required to allege that Defendant "place[d]" the "Canvas" mark on its goods where, as here, the alleged goods are "ultra-thin" and designed for digital display, FAC ¶ 3, such that "the nature of the goods makes such placement impracticable." 15 U.S.C § 1127. In such cases, it suffices that the defendant displayed the mark on "documents associated with the goods or their sale." *Id.* Displaying the mark in an advertisement on a website or social media page satisfies this requirement. *E.g.*, *LoanStreet*, 2022 WL 3544170, at *10 (refusing to dismiss trademark claim where the defendant "purchased advertisements via Google's advertising platform that publicly displayed the [mark]") (gathering cases).

Plaintiff has adequately pleaded "use in commerce" under these standards. Defendant allegedly advertised "WHIM canvases" on its website and social media to potential advertisers, a market from which Defendant was excluded under the License Agreement. FAC ¶¶ 78–80, 83. Defendant also allegedly established an OOH gallery which it advertised as having "up to 80 WHIM canvases in multiple installations." *Id.* ¶ 80. Plaintiff alleges that the License Agreement prohibits such advertisements "precisely to avoid" confusion between Plaintiff's and Defendant's flatscreens in the business-to-business and OOH markets. *Id.* ¶¶ 116–19. At the motion to dismiss stage, Plaintiff's allegations "suffice to demonstrate that [Defendant's] conduct interfered with [Plaintiff's]

ability to attract and retain clients" in its designated markets, "thus constituting a 'use in commerce.'" *LoanStreet*, 2022 WL 3544170, at *10.

Defendant cites to no cases that dismiss Lanham Act claims analogous to Plaintiff's. Defendant relies heavily on *1-800*, but unlike here, the defendant in *1-800* "did not use, reproduce, or display the plaintiff's mark *at all*." *Rescuecom*, 562 F.3d at 128 (emphasis in original) (analyzing the holding in *1-800*, 414 F.3d at 408–09). Defendant also repeatedly cites to *Can't Live Without It, LLC v. ETS Express, Inc.*, but there the defendant's only display of the plaintiff's mark occurred in its "Retail Brands Guide," which compared the plaintiff's and defendant's products and "clearly state[d] that the two are simply similar." 287 F. Supp. 3d 400, 416 (S.D.N.Y. 2018).[10] Here, Plaintiff alleges that Defendant displayed its "Canvas" mark on its website, on social media pages, and in physical galleries in connection with Defendant's competing flatscreen displays. Defendant's alleged conduct thus constitutes a "use in commerce" under Section 1127.

### ii. Likelihood of Confusion

Plaintiff has also adequately pleaded a likelihood of confusion from Defendant's use of its "Canvas" mark. "To prevail on a trademark infringement and unfair competition claim" under Section 1125(a), a plaintiff must plausibly plead "that the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). "The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply

---

[10] The additional cases Defendant cites to are distinguishable for the same reason. In each case, the plaintiff failed to allege any display by the defendant of the mark at issue. *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 515 (S.D.N.Y. 2012) (dismissing Lanham Act claims where the defendant was not alleged to have displayed the trademarked phrase in its videos, except in one instance where defendant used the mark descriptively); *Franklin v. X Gear 101, LLC*, No. 17CIV6452GBDGWG, 2018 WL 3528731, at *10 (S.D.N.Y. July 23, 2018), *report and recommendation adopted*, No. 17CIV6452GBDGWG, 2018 WL 4103492 (S.D.N.Y. Aug. 28, 2018) (similar); *see also Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 399 (S.D.N.Y. 2021) (finding "use in commerce" requirement satisfied where defendant "used a competitor's name as its own domain name").

confused, as to the source of the goods in question." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d

Cir. 2004) (quotation marks omitted). "Likelihood of confusion is a 'fact-intensive analysis that

ordinarily does not lend itself to a motion to dismiss.'" *The Name LLC v. Arias*, No. 10 CIV. 3212

RMB, 2010 WL 4642456, at *5 (S.D.N.Y. Nov. 16, 2010) (quoting *Merck & Co., Inc. v. Mediplan*

*Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006)).

      To start, Defendant does not seriously dispute that Plaintiff has alleged a likelihood of

confusion under the *Polaroid* factors that govern in this Circuit. As explained by the Second Circuit:

> In determining whether there is a likelihood of confusion, we apply the eight-factor
> balancing test introduced in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.
> 1961). The eight factors are: (1) strength of the trademark; (2) similarity of the marks;
> (3) proximity of the products and their competitiveness with one another; (4) evidence
> that the senior user may "bridge the gap" by developing a product for sale in the
> market of the alleged infringer's product; (5) evidence of actual consumer confusion;
> (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of
> the products; and (8) sophistication of consumers in the relevant market.

*Starbucks*, 588 F.3d at 115. Plaintiff has alleged, among other things, that its mark is strong, that

Defendant's mark is "highly similar" to Plaintiff's, and that Defendant's mark has been employed

"where [Plaintiff] operates." *See* FAC ¶¶ 111, 116–17. Defendant makes no argument as to the

*Polaroid* factors, other than to contend without support that "a detailed analysis of the *Polaroid* factors

is not needed to determine that confusion has not been pled." Reply at 3–4. Accordingly, the Court

finds that the *Polaroid* factors support Plaintiff's infringement claim at this stage. *See The Name LLC*,

2010 WL 4642456, at *5; *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 303 (E.D.N.Y. 2014).

      Rather than contest the *Polaroid* factors, Defendant argues that Plaintiff's assignment to

Defendant of the website name "onyourcanvas.com" precludes the possibility of customer

confusion. According to Defendant, its right to a "domain name prominently featuring the 'canvas'

name" establishes its "legal right to associate its products with the term 'canvas.'" Mem. at 11–12.

Defendant argues that customers cannot be confused by its use of a term that they would "already

associate" with its products. *Id.* at 12.

Defendant's right to use the "onyourcanvas.com" website does not defeat Plaintiff's infringement claim.  Even if, as Defendant contends, the right to "onyourcanvas.com" permits Defendant to use the "Canvas" mark in certain contexts,[11] it does not permit Defendant to use the "Canvas" mark in a manner that falls outside the scope of its license.  A licensee's right to use a mark does "not privilege him to use [it] in conjunction with his own [products] in a manner that would confuse the relevant public as to the source of his products" or "enable him to reap . . . the benefit of [the mark's] good will."  *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 (S.D.N.Y. 2000), *aff'd*, 4 F. App'x 81 (2d Cir. 2001); *accord Franchised Stores*, 394 F.2d at 668–69 (observing that trademark licensors can bring Lanham Act claims against licensees who use a mark outside the scope of their license).  Plaintiff does not allege that Defendant has infringed its "Canvas" mark through use of the "onyourcanvas.com" website.  Rather, Plaintiff alleges that Defendant is using the "Canvas" mark in marketing its flatscreens in OOH spaces and directly to businesses by, among other things, establishing a public gallery with Defendant's flatscreens and marketing them to advertisers as "WHIM canvases," FAC ¶ 80, and marketing its flatscreens on social media to advertisers as "the best digital canvases you can find on the market," *id.* ¶ 83.  These alleged uses violate the License Agreement, which prohibits Defendant from marketing and selling its similar products using the "Canvas" mark in the business-to-business and OOH markets.  FAC, Ex. B § 2.1(H).  Because these alleged uses exceed the scope of Defendant's license, they infringe on Plaintiff's mark.  *E.G.L.*, 90 F. Supp. 2d at 296; *GCCA, LLC v. MACCG, LLC*, No. 21-CV-5022

---

[11] Defendant does not proffer any cases finding that the assignment of a domain name authorized a party's use of a trademark.  Instead, Defendant cites to cases addressing the separate question of whether a domain name infringed or diluted a prior mark.  Mem. at 11; Reply at 5; *Soter Techs.*, 523 F. Supp. 3d at 398–99 (infringement claim); *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 497 (2d Cir. 2000) (dilution claim); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010) (infringement and dilution claims).  Moreover, Defendant concedes that, at most, "the grant of the right to call a website 'onyourcanvas' *could* be deemed to encompass a right to refer to products *on that website* as 'canvases.'"  Reply at 5 (emphasis added).  Accordingly, the Court declines at this stage to find that the "onyourcanvas.com" domain name authorized Defendant to use the "Canvas" mark, and especially not outside of the "onyourcanvas.com" website.  *See Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 668–69 (2d Cir. 1968).

(JGK), 2024 WL 837883, at \*10–12 (S.D.N.Y. Feb. 28, 2024); *Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983).[12]

### iii.  Harm

Plaintiff has also adequately pleaded the harm required for its trademark-infringement claim. As Defendant points out, any plaintiff bringing claims under Section 1125(a) must allege proximate causation and harm.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (reading proximate-causation requirement into Section 1125(a)).  However, Section 1125(a) "creates two distinct bases of liability:"  false-association claims, also referred to as trademark-infringement claims, under § 1125(a)(1)(A); and false-advertising claims under § 1125(a)(1)(B).  *Id.* at 122; *see also* 4 McCarthy on Trademarks and Unfair Competition § 27:14 (5th ed.) (explaining that "Lanham Act § 43(a)(1)(B) is a false advertising prohibition and does not relate to trademark infringement claims.").  "There are important differences in the elements" of these two claims, including the harm that a plaintiff must demonstrate.  *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 373 (S.D.N.Y. 2019).  To bring a claim for false advertising, "a plaintiff must demonstrate injury specifically to a 'commercial interest in reputation or sales.'"  *Souza v. Exotic Island Enterprises, Inc.*, 68 F.4th 99, 118 (2d Cir. 2023) (quoting *Lexmark*, 572 U.S. at 131–32).

By contrast, "[i]n a trademark case, a plaintiff may be harmed by virtue of losing exclusive control over its own mark."  *Dependable Sales*, 394 F. Supp. 3d at 373; *accord Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985) (a trademark plaintiff is harmed where it "will lose control over the reputation of its trademark").  A trademark plaintiff can plead injury by pleading likelihood of confusion, since the unauthorized use of its mark "invariably threatens injury to the economic value of the goodwill and reputation associated with [the] mark."

---

[12] Defendant also invites the Court to dismiss Plaintiff's trademark claim as "duplicative of its contract claim" because Plaintiff presents no viable allegations of customer confusion.  Mem. at 13.  Because the Court finds that Plaintiff adequately pleads customer confusion, Plaintiff's trademark claim is not dismissed as duplicative of its contract claim.

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986); *see also Dastar*, 539 U.S. at 28 ("The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks,' and 'to protect persons engaged in . . . commerce against unfair competition.'") (quoting 15 U.S.C. § 1127).  This is true even where the plaintiff cannot plead that infringement "will drive down . . . sales in a direct manner."  *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996); *accord W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970) (awarding disgorgement for trademark infringement even where there was no evidence that plaintiff suffered lost sales, damage to good will, or other monetary damages).  Accordingly, specific commercial injury is not a separate element in a trademark-infringement claim under Section 1125(a)(1)(A).  *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001) (explaining that a trademark plaintiff "must prove (1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and the defendant's"); *Genesee*, 124 F.3d at 142 (observing that unregistered trademark claim will prevail if the plaintiff "has a valid [trade]mark entitled to protection" and "the defendant's use of it is likely to cause confusion").

Defendant disagrees, arguing that all Lanham Act claims—whether for trademark infringement or false advertisement—must plead the "economic or reputational injury" required by the Supreme Court in *Lexmark*.  Mem. at 14; *Lexmark*, 572 U.S. at 133.  Defendant's reliance on *Lexmark* is misplaced.  The plaintiff in *Lexmark* "alleged only false advertising" under Section 1125(a)(1)(B), which the Court expressly distinguished from trademark infringement claims under Section 1125(a)(1)(A).  *Lexmark*, 572 U.S. at 122 ("Section 1125(a) thus creates two distinct bases of liability:  false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."); *see also id.* at 131 (distinguishing the statutory purposes behind false-association and false-advertising claims).  The Court did explain, as a general matter, that all statutory causes of action—including Lanham Act claims—extend only to plaintiffs within the statute's zone of interest and whose injuries were

proximately caused by violations of the statute. *Id.* at 129–32. But *Lexmark*'s requirement that a plaintiff plead "economic or reputational injury" was specific to the false-advertising claims with which it was concerned. *Id.* at 133 ("We thus hold that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception *wrought by the defendant's advertising.*" (emphasis added)). Accordingly, the traditional elements of a trademark infringement claim—protectability and likelihood of confusion—have generally endured in this Circuit since *Lexmark*, without the addition of a separate economic injury requirement. *See, e.g.*, *Souza v. Exotic Island Enterprises, Inc.*, 68 F.4th 99, 110, 118 (2d Cir. 2023) (addressing trademark and false-advertising claims, and only requiring "economic or reputational injury" as to the latter); *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 229, 231 (S.D.N.Y. 2023) (analyzing trademark claim under the "familiar two-prong test," looking for protectability and likelihood of confusion, and only requiring "economic or reputational injury" for separate false-advertising claims); *see also Dependable Sales*, 394 F. Supp. 3d at 373 (observing differences in harm required under trademark and false-advertising claims).[13]

Plaintiff's Lanham Act claim is for trademark infringement, not false advertising. FAC ¶¶ 120–21. Plaintiff is thus required to adequately plead (1) that its mark is protectable, and (2) that Defendant has used the mark in a manner likely to cause confusion. *Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 257 (2d Cir. 2021). As to harm, Plaintiff can plead different kinds of market confusion: "either a diversion of sales, damage to goodwill, or loss of control over reputation." *The*

---

[13] Defendant cites to one other case from within this Circuit, *Millennium Access Control Tech., Inc. v. On the Gate, LLC*, which, quoting *Lexmark*, concluded that a trademark plaintiff must allege "an injury to a commercial interest in sales or business reputation." No. 15-CV-6067(SJF)(AKT), 2017 WL 10445800, at *12 (E.D.N.Y. Feb. 14, 2017) (quoting *Lexmark*, 572 U.S. at 140). The full sentence from which *Millennium* quotes makes clear that the *Lexmark* court was addressing false-advertising claims, not trademark claims: "To invoke the Lanham Act's cause of action *for false advertising*, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation." *Lexmark*, 572 at 140 (emphasis added). *Millennium* otherwise cites exclusively to cases outside of this Circuit. 2017 WL 10445800, at *12. Accordingly, the Court declines to follow the holding in *Millennium*, which in any event is not binding on this Court.

*Sports Auth.*, 89 F.3d at 963 (quoting *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581 (2d Cir. 1991)).  Plaintiff alleges, among other things, that Defendant is using its Canvas mark to "describe its similar products" in public and digital spaces "where [Plaintiff] operates." *Id.* ¶¶ 116–17. Plaintiff alleges that these uses are likely to cause market confusion or mistake by misleading consumers into "believ[ing] that [Defendant] is eligible to sell" to businesses and in OOH spaces. *Id.* ¶ 116.  Defendant essentially concedes these points at this stage.  Reply at 3–4 (not meaningfully disputing *Polaroid* factors).  Accordingly, the Court finds that Plaintiff has adequately pleaded harm for the purposes of its trademark claim.

### iv.  Fair Use

Lastly, Defendant's fair use defense fails at this stage.  Fair use is an affirmative defense to a trademark claim, requiring the defendant to demonstrate "three elements:  that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *Solid 21, Inc. v. Breitling U.S.A., Inc.*, 96 F.4th 265, 275 (2d Cir. 2024) (citation omitted).  "Because fair use is an affirmative defense, it often . . . is inappropriate to resolve on a motion to dismiss." *Kelly-Brown*, 717 F.3d at 308; *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590, 114 S. Ct. 1164, 1177, 127 L. Ed. 2d 500 (1994) (noting that the proponent of a fair-use argument "carr[ies] the burden of demonstrating fair use"); 1 McCarthy on Trademarks and Unfair Competition § 11:49 (5th ed.) ("Because classic fair use is an affirmative defense, it is normally not appropriate for consideration on a Fed. Rule Civ. Proc. 12(b)(6) motion to dismiss.").  "In fact, the Court of Appeals for the Second Circuit has cautioned that due to the 'fact-driven nature of the fair-use determination,' courts should be cautious in finding fair use as a matter of law even on a motion for summary judgment." *M. Shanken Commc'ns, Inc. v. Cigar500.com*, No. 07 CIV. 7371 (JGK), 2008 WL 2696168, at *10 (S.D.N.Y. July 7, 2008) (quoting *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir.1991)).  Nevertheless, "[f]air use can be adjudicated at [the motion to dismiss] stage if the 'facts necessary to establish the defense

are evident on the face of the complaint.'" *Solid 21, Inc. v. Richemont N. Am., Inc.*, No. 19 CIV. 1262 (LGS), 2020 WL 3050970, at *5 (S.D.N.Y. June 8, 2020) (quoting *Kelly-Brown*, 717 F.3d at 308).

Defendant's fair-use defense fails because it is not clear from the face of the FAC that Defendant used the "Canvas" mark "in a descriptive sense." *Kelly-Brown*, 717 F.3d at 308.[14] "A use of a mark is descriptive if the words were used to describe the ingredients, quality or composition of a product, not the source of the product." *Solid 21*, 2020 WL 3050970, at *6 (quoting *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 425 (S.D.N.Y. 2008), *aff'd*, 329 F. App'x 333 (2d Cir. 2009)). This is often true "[w]here a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods," *EMI Catalogue*, 228 F.3d at 65, or where the term "is in common usage," *Kelly-Brown*, 717 F.3d at 311. On the other hand, the use of a mark is less likely to be descriptive where a different term would ordinarily describe the product associated with the mark. *See EMI Catalogue*, 228 F.3d at 65 (holding that the slogan "Swing Swing Swing" for golf clubs was not descriptive because "the ordinary term for [a golfer's] action involves the single word 'swing'").

The FAC alleges that "the word 'Canvas' was not generally used to refer to digital flatscreen displays until [Plaintiff] began using that mark in connection with its products," and that consumers now "recognize 'Canvas' to be associated with [Plaintiff's] flatscreen displays." FAC ¶¶ 109–10. The FAC also alleges that the term "Canvas" is not the only reasonably available description for its flatscreen displays, because it "does not inherently connote a digital flatscreen display." *Id.* ¶ 111. That other terms could be used to describe Defendant's flatscreen products is a reasonable inference at this stage. *See Solid 21*, 2020 WL 3050970, at *6. It is true, as Defendant points out, that Plaintiff repeatedly uses "canvas" to refer to Defendant's products in addition to its own, including in the

---

[14] "Because Defendant[] bear[s] the burden of establishing that each prong of the affirmative defense is evident on the face of the [FAC]," it is unnecessary to discuss the other two elements of Defendant's fair-use defense. *Glob. Brand Holdings, LLC v. Rae Dunn Design LLC*, No. 23-CV-1644 (DEH), 2024 WL 96537, at *2 n.2 (S.D.N.Y. Jan. 9, 2024).

License Agreement and Services Agreement.  *E.g.*, *id.* ¶¶ 36, 41, 91, Ex. A, Ex. B.  But at this stage, Plaintiff's own liberal use of the term "canvas" does not render it plainly evident that Defendant used the term in connection with its flatscreens "in a purely descriptive sense."  *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 92 (2d Cir. 2020) (quoting *Kelly-Brown*, 717 F.3d at 308).[15]

Accordingly, the Court declines to dismiss Plaintiff's trademark infringement claim under Section 1125(a).

### B.  Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff asserts a breach by Defendant of the implied covenant of good faith and fair dealing arising from the Services Agreement.  FAC ¶¶ 145–57.  As pleaded, Plaintiff's implied-covenant claim fails because it is not separate and distinct from Plaintiff's claim for breach of the Services Agreement.

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."  *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (quoting *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992)).  As a result, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Id.* at 81 (affirming dismissal of implied covenant of good faith and fair dealing claim as duplicative of breach of contract claim).

The implied covenant of good faith and fair dealing is a "pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive

---

[15] The USPTO letters attached to Defendant's Supplemental Declaration likewise do not render it plainly evident that Defendant's use of the Canvas mark was purely descriptive.  The letters reject a separate company's application for registration of a similar—but not identical—putative mark, as descriptive of its potentially similar—but again not identical—goods.  Even assuming, without holding, that the Court could draw inferences as though the letters' contents were true, the USPTO's rejections are merely "one of several considerations in a fact-intensive analysis."  *Kelly-Brown*, 717 F.3d at 311.  They do not warrant dismissal at this stage.  *See M. Shanken Commc'ns*, 2008 WL 2696168, at *10 (noting dismissal on fair-use grounds is generally inappropriate given the "fact-driven nature of the fair-use determination").

the fruits of the contract." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)).

On the other hand, the implied covenant does not include any obligation "inconsistent with the express terms of the contract," and it "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 752 (S.D.N.Y. 2016), *aff'd*, 712 F. App'x 57 (2d Cir. 2017) (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam)). Nor can the covenant "add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (alterations omitted) (quoting *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y. 1993)). Therefore, to plead both a breach of contract claim and an implied-covenant claim, a plaintiff must thread the needle of "alleg[ing] an implied duty that is consistent with the express contractual terms, but base[d] . . . on allegations that are distinct from the factual predicate for its contract claims." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-cv-9116, 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009).

Plaintiff's implied-covenant claim fails to thread the needle. Plaintiff alleges that Defendant breached the implied covenant by abandoning the development of its next-generation flatscreen, WHIM NEXT, which the "Services Agreement contemplated" as the predicate for Plaintiff's next-generation flatscreen, NEXT E. FAC ¶¶ 148–56. The Services Agreement provided that Defendant would "be responsible for all costs associated with the development of the WHIM NEXT platform," and required Defendant to "provide [Plaintiff] with . . . all necessary and

appropriate technical services to create a lower cost derivative canvas based on [the WHIM NEXT platform.]"  FAC, Ex. B at Ex. B.  Defendant's alleged abandonment of the WHIM NEXT platform goes directly to these provisions of the Services Agreement.  It does not support a claim distinct from Plaintiff's claim for breach of the Services Agreement, *JPMorgan Chase Bank*, 2009 WL 321222, at *5, or give rise to damages distinct from the "damages allegedly resulting from a breach of the [Services Agreement]."  *Parlux Fragrances, LLC v. S. Carter Enterprises, LLC*, 204 A.D.3d 72, 92 (1st Dep't 2022) (quoting *MBIA Ins. Corp. v Merrill Lynch*, 81 A.D.3d 419, 419–420 (1st Dept 2011)).

Nor did the implied covenant separately provide a one-year time limit for Defendant to complete the development of WHIM NEXT.  Plaintiff notes that the Services Agreement expired after a one-year term, and that Plaintiff's NEXT E product was to be released "within 60 days of the release of WHIM NEXT assuming [Plaintiff] ha[d] met the details for specification decisions."  FAC ¶¶ 148, 150; *id.* Ex. B § 3.1.  Plaintiff claims that, under the covenant of good faith and fair dealing, "it was reasonably implied that [Defendant] would release the WHIM NEXT," and then Plaintiff the NEXT E, before the one-year term expired.  *Id.* ¶ 150.  This asks too much of the implied covenant, which cannot "add to the contract a substantive provision not included by the parties."  *Broder*, 418 F.3d at 199 (alterations omitted).  The parties could have agreed to a specific timetable in the Services Agreement for development of the WHIM NEXT, but they did not.  FAC ¶ 150.  And while it is true, as Plaintiff points out, that "New York law implies a reasonable time period" for performance where a contract does not specify one, Opp'n at 19 (quoting *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007)), that implication applies to obligations established by the contract itself. *See Schwartz v. Rosenberg*, 67 A.D.3d 770, 889 (2d Dep't 2009) (holding defendant breached contract after failing to perform within contract's implied reasonable time period); *Tedeschi v. Northland Builders, LLC*, 74 A.D.3d 1613, 1614 (3d Dep't 2010) (same); *see also Guilbert*, 480

F.3d at 149–50 (interpreting contract).  It does not give rise to a distinct claim under the implied covenant, as a failure to perform in a reasonably timely manner "is merely a breach of the underlying contract." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 505 (S.D.N.Y. 2020), *aff'd*, 29 F.4th 118 (2d Cir. 2022) (quoting *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018)).

Accordingly, WCA's implied covenant of good faith and fair dealing claim is dismissed.

### C.  Conversion

Both of Plaintiff's conversion theories must also be dismissed, because they fail to allege conversion as more than a hypothetical.  Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 827 N.Y.S.2d 96, 100 (2006).  "To state a claim of conversion, the plaintiff must allege that (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." *V&A Collection, LLC v. Guzzini Properties Ltd.*, 46 F.4th 127, 133 (2d Cir. 2022) (quoting *Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 251 (S.D.N.Y. 2009)).  Neither of plaintiff's conversion claims satisfies these elements.

### i. Tooling

Plaintiff's first conversion theory alleges conversion of certain tooling used to develop the parties' next-generation platforms.  FAC ¶ 160.  This theory fails because Plaintiff has not alleged a demand for the tooling's return and Defendant's refusal of this demand.  "[D]emand for return and a refusal are required to state a claim for conversion under New York law." *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 322 (S.D.N.Y. 2010); *accord V&A*, 46 F.4th at 133.  Plaintiff alleges neither.  Plaintiff alleges that it provided funding to Defendant to develop tooling for the

parties' next-generation flatscreens, that Defendant used this funding to pay a third-party vendor for tooling, and that the third-party vendor has since "expressed confusion" as to whether Plaintiff or Defendant "owns the tooling." FAC ¶¶ 45–47. Plaintiff does not allege that it has demanded this tooling from Defendant, and it concedes that Defendant has never refused such a demand. *Id.* ¶ 166 ("*If* [Defendant] *were to refuse* to permit [Plaintiff] to use the tooling, it would create further delays." (emphasis added)). This is insufficient to sustain a claim for conversion. *Schwartz*, 984 F.2d at 54; *see also Johnson v. Gumer*, 94 A.D.2d 955, 955 (4th Dep't 1983).

### ii. Office Equipment

Plaintiff's second conversion theory alleges conversion of office equipment by Defendant's "affiliate" or "subsidiary," but not by Defendant itself. FAC ¶¶ 159, 171. This claim fails because Plaintiff has not adequately pleaded that Defendant controlled the actions of its subsidiary. To sustain a conversion claim against a corporate parent for the actions of its subsidiary, a plaintiff must adequately plead that the parent controlled the subsidiary's actions. *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012). A viable claim against a tortfeasor's parent must, "[a]t the very least," allege "direct intervention by the parent in the management of the subsidiary to such an extent that the subsidiary's paraphernalia of incorporation, directors and officers are completely ignored." *Billy v. Consol. Mach. Tool Corp.*, 51 N.Y.2d 152, 163 (1980) (quotation marks omitted). "A corporate parent's ownership interest in a subsidiary, standing alone, is insufficient" to sustain a conversion claim against the parent. *Bigio*, 675 F.3d at 175–76 (dismissing conversion claim against corporate parent).

Plaintiff does not adequately plead Defendant's control over its subsidiary. Plaintiff alleges that Defendant's subsidiary converted equipment from an office leased by Plaintiff's Canadian affiliate in Montreal. FAC ¶¶ 92–95, 103. Defendant's subsidiary allegedly argued in a Canadian court that it was occupying the Montreal office because of an agreement between Plaintiff and

Defendant. *Id.* ¶ 95. But Plaintiff's only allegation regarding Defendant's participation in the conversion is that it gave its subsidiary "permission" to convert the office equipment. *Id.* ¶ 162. This falls well short of the "complete domination" that Defendant must have over its subsidiary in order for liability to attach. *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 614 n.8 (S.D.N.Y. 2003). Courts have refused to hold parent corporations liable "in the presence of considerably more indicia of parental control." *Bigio*, 675 F.3d at 176 (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459–62 (2d Cir. 1995) (dismissing tort claims against parent where parent and subsidiary shared a centralized cash management system and subsidiary needed approval from parent before executing important financial transactions).

### D. Declaratory Judgment Regarding Plaintiff's Termination of the License Agreement

Plaintiff's final cause of action seeks a declaration that it validly terminated the License Agreement upon Defendant's alleged material breach, because the License Agreement's "Term and Termination" clause permitted such termination. FAC ¶ 178. The Court declines to dismiss Plaintiff's claim at this stage.

Under the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act does not require a court to issue a declaratory judgment. Instead, the Act "confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)). In deciding whether to entertain an action for declaratory judgment, the Court asks "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). Defendant does not dispute that these conditions are met here. Mem. at 15–16. It disputes only

that the License Agreement permitted Plaintiff's termination.

The "Term and Termination" clause in the License Agreement does not preclude termination of the contract upon material breach. The clause provides two conditions which would cause the License Agreement to terminate, FAC, Ex. A § 9.1(A) (providing that "this Agreement *shall expire* on the date on which" all cross-licensed intellectual property expires or becomes unenforceable) (emphasis added); *id.* § 9.1(C) (providing that the License Agreement "*shall forthwith terminate* upon the mutual written agreement of the Parties") (emphasis added), and one condition which would give Plaintiff the option to cause the License Agreement to terminate, FAC, Ex. A § 9.1(B) ("This Agreement *may be terminated* by [Plaintiff] if [Defendant] commits a Payment Breach under the Services Agreement.") (emphasis added). The clause does not state that these are the only conditions under which the License Agreement can be terminated.

Because the License Agreement's list of termination possibilities is not exhaustive, Plaintiff has adequately pleaded that the agreement could be terminated as a result of Defendant's prior material breach. A fundamental background principle of New York contract law provides that an "aggrieved party can elect to terminate the contract" upon a "material breach." *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 408–09 (S.D.N.Y. 2000); *accord Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 498 (S.D.N.Y. 2007) ("When one party materially breaches an agreement, the nonbreaching party may terminate that agreement and sue for total breach."); *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 618 (S.D.N.Y. 2004) ("As a general principle of contract law, a material breach excuses the other party's nonperformance.") (gathering authorities). "Where, as here, a contract is negotiated by sophisticated parties at arm's length," the Court will not interpret the License Agreement as impliedly contracting out of this background principle where "the parties have neglected to specifically [do so]." *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 302 (S.D.N.Y. 2010) (quoting *Vt. Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 775 N.Y.S.2d 765, 768 (2004)). To

read the Term and Termination clause as precluding termination upon material breach, rather than simply listing events which would or could trigger termination, "would require adding terms to the contract," "thereby mak[ing] a new contract for the parties under the guise of interpreting the writing." *ELBT Realty, LLC v. Mineola Garden City Co.*, 144 A.D.3d 1083, 1084 (2d Dep't 2016).

As Plaintiff points out, the Second Department came to much the same conclusion in *Ma v. Biaggi*, 150 A.D.3d 778 (2d Dep't 2017). In *Ma*, the seller in a real-estate deal terminated the contract of sale after the buyer failed to tender the full down payment amount. *Id.* at 779. The contract of sale provided, in language analogous to the Term and Termination clause in the License Agreement, that "in the event the transaction contemplated by this agreement shall not close on account of purchaser's default, then this agreement *shall terminate.*" *Id.* at 779–80 (emphasis added). The court rejected an argument that this clause prevented the seller's termination before closing, because "nothing in the plain language of [the clause] prevents [the seller] from terminating the contract prior to closing as a result of [the buyer's] material breach." *Id.* at 780. Interpretating this language as precluding other avenues for termination "would require adding terms to the contract that the parties did not include." *Id.* The same is true of the unrestrictive language in the License Agreement's Term and Termination provision. FAC, Ex. B § 9.1.

By contrast, *Fresh Del Monte Produce Inc. v. Del Monte Foods, Inc.*, on which Defendant heavily relies, addressed a termination clause that "expressly state[d] that the [contract] is perpetual unless terminated under its provisions." No. 13-CV-8997 (JPO), 2016 WL 236249, at *8 (S.D.N.Y. Jan. 20, 2016) (dismissing termination claim where termination provided that "the agreement, 'unless sooner terminated under the provisions set forth in this [provision], is perpetual"). *Fresh Del Monte* is not apt here, because Term and Termination provision nowhere "expressly provides" that it is "the *only* basis for complete termination of the [License Agreement]." *Id.* at *7 (emphasis added).[16]

---

[16] The other cases Defendant cites are even less persuasive. *See A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 381 (1957)

Accordingly, "accepting [Plaintiff's] allegations as true and drawing every inference in its favor," Plaintiff has plausibly alleged that it was in compliance with the License Agreement when it terminated upon Defendant's material breach.[17] *L-7 Designs*, 647 F.3d at 434. Plaintiff's declaratory-judgment claim thus survives.

## VI.    CONCLUSION

For the reasons stated herein, Defendant's motion to dismiss is granted as to Count IV, for breach of the implied covenant of good faith and fair dealing, and Count V, for conversion. Defendant's motion to dismiss as to Count I, for trademark infringement, and Count VI, for declaratory judgment, is denied. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 32.

SO ORDERED.

Dated: September 3, 2024
        New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

(holding that terminating party did not violate written provision allowing for termination "at any time"); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 434 (2d Cir. 2011) (reversing dismissal of declaratory-judgment claim seeking confirmation that party had failed to meet termination provision's notice requirements); *Rosehoff, Ltd. v. Cataclean Americas, LLC*, No. 21-CV-399-LJV-LGF, 2022 WL 17252373, at *7 (W.D.N.Y. Nov. 28, 2022) (noting that if ambiguous license agreement were found to be irrevocable, then it could not be terminated); *Blumberg v. Florence*, 143 A.D.2d 380, 380–81 (2d Dep't 1988) (finding seller had failed to satisfy conditions precedent to contractual right of termination).

[17] Defendant does not dispute Plaintiff's allegations of material breach in its motion. Mem. at 4. The Court finds that Plaintiff has adequately pleaded material breach at this stage. FAC ¶¶ 89–90.